COALITION V. UNITED STATES MR. DE FRANCESCO. Your Honors, may it please the Court, I'm Robert DeFrancesco with Wiley-Rind, counsel of plaintiff appellant, Wind Tower Trade Coalition. Plaintiff is here today seeking a preliminary injunction to prevent the Department of Commerce from refunding preliminary anti-dumping and countervailing duty cash deposits that have been collected during the provisional measures period. This is the first hearing plaintiff has had on this issue since filing its appeal challenging the Department's determination to treat the International Trade Commission's loan threat of material injury vote as controlling under the special rule. This means that despite the fact that a majority of the affirmative commission votes finding that subject imports entered during the period of investigation that were injurious, the Department will refund these cash deposits on those entries instead.  WIND TOWER TRADE COALITION V. UNITED STATES But Commerce relied on MBL, Aquilino's case, to consider all six, not just the three. MR. DE FRANCESCO. Yes, Your Honor, that's correct. We believe in our papers as we've described that the Court of International Trade's reasoning in MBL is inappropriate and is not an appropriate application of the statute, that that reasoning leads to a conclusion where both the general rule and the special rule are not applicable. Neither rule would be applicable because while you can't apply the general rule under their analysis, likewise, you wouldn't be able to apply the special rule either. MR. DE FRANCESCO. Has MBL ever been overruled or criticized by this Court? MR. DE FRANCESCO. No, it has not, Your Honor. Getting back to your original question, under that analysis, you would have a situation where you would have only one commissioner reaching the determination under the special rule. The special rule requires that the commission find a threat of material injury with a negative but-for, and only one commissioner, Commissioner Pinkert in this case, made that finding. And that's why we believe that that type of interpretation is inappropriate under the statute. The proper interpretation is counting only the affirmative votes when analyzing either the general or the special rule, as the Commerce Department did prior to the MBL decision.  GOTTLIEB. Well, if we analyzed only the affirmative votes, how would that comport with the statute's clear language in both sections, general and special rule, which say, if the commission finds. So the commission is not a majority of the equally tied votes in one camp. I mean, that can't ever be interpreted properly as the commission. So. MR. FRANKLIN. Your Honor, in Section 1677-11, the statute sets out the number of votes required for an affirmative determination. GOTTLIEB. Well, it says when there's a tie, that's a vote in favor. MR. FRANKLIN. Correct. And in this case, there is a tie. There are three affirmative votes and three negative votes. And at that point, the commission's determination is an affirmative. The question then becomes, how does the Department of Commerce apply that affirmative determination? What is the commission's determination an affirmative of? It says if the commission finds material injury or threat of material injury, and then in the special rule, it finds material injury other than threat of material injury. So where, in which of those two camps is there three votes? MR. FRANKLIN. There are only two votes for present material injury and one vote for threat of material injury. MS. GOTTLIEB.  And that's within either the general rule or the special rule. So if I were to adopt your interpretation, then you don't fall under either rule. MR. FRANKLIN. But we would say that actually the proper interpretation in this case for the general or the special rule requires the court to look at the word find, so the commission has to make a finding. MS. GOTTLIEB. Well, no. But you just explained to me that the only time the commission makes a finding is when there are three votes. So the commission only finds material injury or threat of material injury when there are three votes. The commission only finds that there's a threat of material injury other than the threat of injury described in one when there are three votes. That's the only time the commission finds it. You referred me to 1677, which explains that. So if I adopt your construction, we end up in a situation where you don't fall under either the general or the special rule, and I don't think anybody finds that to be very palatable. That's why your construction is causing me so much problem.  FRANKLIN. Certainly. We believe 1677.11 identifies the pool of votes to look at. Now, if, as Your Honor is saying, you don't fall under either the general rule or the special rule, we then don't believe it's reasonable to leave the holding of the commission, the controlling vote, as being a lone vote. The need to MR. GOTTLIEB. That happens all the time. When you have a panoply of commissioners, and it can be a tie or not a tie, one vote often is a controlling vote. Is it not? FRANKLIN. Respectfully, Your Honor, this type of voting pattern does not happen frequently. In fact, it's very unusual, and normally— MR. GOTTLIEB. There are 4-2 votes, are there not? FRANKLIN. Yes, there are. MR. GOTTLIEB. Lots of them, right? FRANKLIN. Yes.  GOTTLIEB. If one vote switches and goes to affirmance, then you have a tie, right? And that one vote becomes the controlling vote, does it not? MR. FRANKLIN. Right, but at that point, Your Honor, you have three affirmative threat votes and one present material injury vote. You don't have that pattern here. You have two affirmative present material injury votes and only one threat vote. MR. GOTTLIEB. Do you— MR. GOTTLIEB. Not in my hypo, you had three and three. MR. FRANKLIN.     MR.  You have a three and three determination. MR. GOTTLIEB. Somebody switches. MR. FRANKLIN. Well, in line pipe, for example, there was a three, three. There were three present material injury votes and three threat of material injury votes. And in that context, it was treated as the general rule was applicable. And at that point, you don't have under the analysis in MBL, you would have to have a majority and you don't have a majority in either camp. Yet the general rule is applicable in that scenario and it wasn't applicable in ours where you do have a majority. MR. GOTTLIEB. My point is that one vote often makes a difference in these commissioned votes.  FRANKLIN. Certainly. MR. GOTTLIEB. So your complaint that one vote doesn't matter or is irrelevant or is controlling when it shouldn't be doesn't hold water for me. MR. FRANKLIN. I think what we're—we're not saying that each commissioner's vote doesn't matter. What we're saying is two votes should outweigh the single vote of the commission. And in this case, we believe that the two affirmative present material injury votes  MS. GOTTLIEB. Do you find wrong—are you arguing that the CIT and Commerce was wrong when they held that a broader finding of material—that injury—basically if the two people found injury that inherently includes also a finding of threat on their part. Do you believe that that is wrong? MR. FRANKLIN. Yes, Your Honor. We do believe that's wrong. Under 1677-7 of the statute where Congress sets out the factors the commissioners must interpret when making a present material injury finding or a threat finding, not only do they have to address these factors, they also have to, under that section of the statute, articulate their reasoning under each of those factors. And Commissioners Williamson and Aronoff, who were the two affirmative votes here, did not examine any of the threat factors under 1677-7. MS. GOTTLIEB. Aren't they duplicative? MR. FRANKLIN. No, Your Honor, they're not. They're—the threat factors under 1677, while they're related, they don't examine exactly the same issues. MS.  Well, in terms of the injury, I guess, when I looked at those factors, I sort of thought that the threat factors were, at a minimum, subsumed within the injury factors such that any fact finding that went so far—like, if I say, if I find, as a matter of fact, you ran two miles, well, then nobody can dispute you ran one mile, right? Isn't that the way it works? And those—when I looked at those factors and went back and forth between them—please stop nodding. Please stop nodding. MR. FRANKLIN. Okay. MS. I mean, I'm not sure that I had of them, which was that it sort of subsumed— MR. FRANKLIN. Certainly, Your Honor. But in this scenario, those commissioners, under the law, would have to actually articulate reasoning under those factors. And they haven't done that here. Now, the defendant has used the Supreme Court decision in Marx as an example of a scenario where you would attribute a more narrow holding. But we don't believe that the Supreme Court decision there in Marx is appropriate. The Supreme Court in Marx was interpreting the memoirs Supreme Court decision in which you had three judges, three justices, in the controlling plurality opinion and three justices entering two concurring opinions. And the Supreme Court in Marx did not attribute additional findings to the other concurring opinions. The Supreme Court in Marx said the more narrow holding of those three justices was controlling. Just as we're saying here, you shouldn't attribute a finding to the two present material injury determinations. MS. I don't know. But in this case, when you look at the actual thing we're talking about, it seems difficult to me to conclude there's injury without threat. I mean, that just—it seems absurd. I mean, if I punch you, which is battery, I had to have assaulted you, which is threatened you along the way. I mean, you don't see them—you don't see battery without assault because by virtue of having hit you, you were in fact threatened. So why—I'm analogizing the criminal law, which I understand is outside the purview of what we're talking about. But why doesn't that analogy hold here? If you were in fact injured, why isn't it automatic that you were threatened prior to? MR. Your Honor, that's simply not how the statute works. The statute requires a separate analysis of threat. In fact, in cases where the International Trade Commission's determinations are appealed and then overturned, I would point you to Nippon Steel v. U.S., where in that situation the commission made an affirmative present material injury finding, which was then reversed by the court. The court then remanded it back and ordered the commission to then examine those threat findings. It didn't assume that they couldn't reach a threat finding either. It required—the statute requires findings under each scenario separately. Well, but they sent it back because they needed the commission to look at what factors they had erroneously resolved in favor of an injury finding and then analyze whether the lesser standard of threat was nonetheless met. I mean, that's why the court couldn't dispense with it either way. It doesn't make sense. I guess given all of our back and forth and the difficulty I'm finding with the general rule and the special rule and, quite frankly, making sense out of it, why isn't all of that leading me to the conclusion that these rules are not clear in either direction, hence ambiguity requires deference? Why then don't I accept the government's argument and give deference to their interpretation? Certainly. We believe when you're examining the general and the special rule, if to the extent your analysis still has to be reviewed in the context of those rules and what Congress was trying to do when they set out those rules. And if you look at the structure of the general and the special rule, the but-for analysis that's contained in those two rules do not exist anywhere else in the statute. They only exist within the general and the special rule. I don't understand. The standard under Chevron is unreasonable, right? The standard is the agent—once the statute is ambiguous, and I understand that you don't think it is, but if I were to conclude it was, then I have to accept the agency's interpretation unless it's unreasonable. So how is it unreasonable? Certainly. We believe that based on the structure of the general and the special rule, Congress was intending that the general rule be applied more often and that the special rule not act as the default position. If you can't apply the general rule, then I automatically default to the special rule. But that wasn't what Congress intended based on the structure of the statute. And in light of that, when you're reviewing the reasonableness of what they have done, that it's simply not reasonable to say the one threat of material injury vote should hold sway when we have two present material injury votes. Okay. This is where I want to give you an opportunity to deal with this because I think the government really exposes a logical fallacy in your position. In the red brief at 22, they say, if anything, however, and I'm sort of paraphrasing, the coalition's position constitutes an unreasonable interpretation of the statute's plain language because one can hardly construe the ITC to have, quote, found material injury when four of six commissioners explicitly rejected that finding, whereas the ITC's vote breakdown entails  that. Indeed, Commerce and MBL espouse the interpretation that the coalition now asserts, thereby ignoring the votes of half of the ITC commissioners, and the CIT held that interpretation to be unreasonable, taking us all the way back to where I started with you. I find them very persuasive on this. Certainly, Your Honor. Obviously, we would disagree. We do not believe that the language of the special rule requires that in order for it to be applicable, the commission have found present material injury with a negative but for, and that's not what the commission found here. There's only one commissioner that reached that conclusion, and we don't believe that you can then attribute those findings to the other two affirmative votes. Likewise, you wouldn't be able to attribute the negative findings either because the negative findings don't find any material injury or threat of material injury, and likewise, we don't believe it's appropriate to count the negative findings in analyzing either the general rule or the special rule, in which case, you ought to only be left with the affirmative votes, which was Commerce's practice prior to MBL. I see I'm almost out of time. I'd like to... We're saving you a rebuttal time. We've given the other side a little bit of extra time. Are you satisfied with that answer for the present? All right. Thank you. I can tell you to find satisfied, but yes. Thank you, Mr. DeFrancisco. Mr. Kerlin. Thank you, Your Honor. May it please the Court. The trial court in this case did not abuse its discretion in recognizing that Commerce acted reasonably in declining to treat a position that lost on an explicit 42 vote before the overall finding and the determination. That WTTC's position is not compelled by the statute, and all of the cases that have dealt with this issue have treated it as a Chevron Step 2 issue, which means the question for the trial court, which it appropriately applied, is whether Commerce's actions in this case constitute a reasonable interpretation of the statute. And indeed, Commerce's common sense interpretation to look at all of the Commissioner's votes rather than ignoring, essentially, the votes of half the Commission and looking at only the votes of the Commissioners voting in the affirmative is reasonable. I'd like to go directly to address what I think are the three main points that petitioners made in their presentation. The first point that they made was that it was inappropriate to treat the vote of a single Commissioner as if it's controlling. As Judge Wallach pointed out, that kind of a thing occurs all the time, and one doesn't need to go to kind of hypotheticals about changing votes to do that. That type of thing occurs all the time in federal court jurisprudence when lower courts interpret appellate courts and, indeed, Supreme Court decisions. When there are plurality opinions and one justice concurs on the narrowest grounds, the Supreme Court has instructed that the appropriate way to consider those opinions and this is the Marks case, is to consider the controlling opinion the ground asserted by the justice concurring on the narrowest grounds in the opinion. And there's actually been some additional briefing on this issue in our currently pending motion to dismiss before the trial court, but there are certainly, I could cite cases where the Supreme Court has treated the vote of a single justice as being controlling. I should further note that Marks is certainly still good law. It was applied by this court as recently in 2012 and one can check the citing references. It's been applied repeatedly, most recently by the Third Circuit in August in an en banc decision where the issue was not whether Marks was good law or not, but whether it was appropriate to even apply Marks to a majority opinion. The second issue that WTTC raised was the claim that you can't apply this rule and you can't apply either of the rules unless you pursue its clipped analysis by ignoring the votes of a third of the commission. And that also respectfully is incorrect. As we pointed out and as your honors quoted from our briefs, the votes here are lined up. While you can't apply the general rule here because it would be taking what's clearly a minority position on the ITC and trying to turn it into the ITC's overall finding, one can certainly apply the special rule here because you do have three votes that found at least a threat of injury. Why? He is right. The factors are different. They're not all subsumed clearly in my mind, so why? They didn't find a threat or any alternative injury. Commissioner Aronoff and the other gentleman, I don't remember who it was, didn't expressly find a threat and they are different analyses. Well, I think there's a kind of logical answer to that and a more formalistic legal answer. I think the logical answer is the one your honor articulated in WTTC's presentation. There's a clear inherent logical nature of that if you've gone all the way, I don't know, I could deck you. Out of the blue, you didn't see it coming, you never felt threatened. Right? Isn't that possible? Sure, but again, this isn't... I'm not saying it's possible, I would actually deck you, let's be clear. I'm thankful for that, your honor. But also thankful that we're not in a criminal law context. So just to wrap up the logical point, when we're here in a trade contest, it's hard for me to imagine a situation in which a domestic industry is injured by the importation of wind towers from China without also being threatened by the importation of wind towers from China. But there's also a more formalistic legal... But you're not saying that that's logical, that you can be injured without being threatened. I'm saying it is... Right, it's not logical that you... You're using a double negative, so try and say it affirmatively. Right, I think our position is that if you are injured, you are inherently also threatened. But it is a two-step process. Well, it's a two-step process, but... Your opponent's right about that. But I would take issue with his position that the factors for injury and threat of injury don't overlap. And I, particularly in preparing for this argument, looked at the NDW and countervailing duty handbook, the different factors that the ITC considers. And there's actually quite considerable overlap, and I would posit even subsuming of the injury factors in the threat determination or vice versa. When you're looking at injury, you're looking at volume, price, and effect on the production in the domestic industry. And all three of those factors are also subsumed in the threat analysis. The handbook itself lists factors 3, 4, and 8, which are volume, price, and effects on the domestic industry. There are some additional factors that are considered in a threat analysis by the inherent, more amorphous nature of the analysis, because you're considering a threat and not the actual injury. But they all go to... You're identifying the industry, among other things. Right. And so you're going to similar... You're going to similar issues and essentially going to the same type of inquiry as effectively one is subsumed in the other. So there's considerable overlap, even kind of formally, in the type of analysis that occurs. But I don't think the court needs to go that far. Logically, it's pretty hard to imagine a scenario, again, where the domestic industry would be injured without being threatened. But we do have to go pretty far. In order to adopt your position, we have to find that any time there is an injury determination, there is automatically also a threat determination made by the same individual commissioner. We do have to go that far. We've got to find that the threat is absolutely, in all cases, subsumed within an injury determination. Or we have to defer to the interpretation of your own rules. Well, that's correct. And here, again, the standard, this is properly a Chevron 2 analysis. And in fact, I've laid on top of that an abusive discretion analysis because we're dealing with the denial of a preliminary injunction. So here, Congress has taken the common-sense interpretation, which is, by the way, consistent with the baseline way that these issues are looked at, not just in terms of Supreme Court's teaching on how to look at a split determination, but also the baseline way that this Court has looked at decisions of the ITC, where this is the U.S. Steel Group, a unit of U.S.X. case, where the Court has said the Commission makes its determination by the votes of six members. And indeed, the statute itself refers to the Commission and not the majority. So I hear you telling us that the decision is not necessarily correct on its objective merits, but we should defer? Well, we think the decision is correct on its objective merits. I think it would be helpful to... Well, let's talk about the objective merits. Okay. Well, again, here you have one Commissioner making a threat finding, two making a broader finding that Congress interprets correctly, we believe correctly, as inherently entailing the narrower threat finding. And then you have, on the other hand, when it comes to application of the general rule, you have four Commissioners who explicitly voted against that position. So there's no interpreting or inherency in the general rule. There you have four Commissioners, Commissioner Pinkert and the three Commissioners who voted in the negative, who explicitly voted and wrote opinions rejecting the position that WTTC wants to treat as if it's the ITC's overall finding. So to then engraft the reasonableness analysis here, again, this is an issue that has been considered now several times by the Court of International Trade, in NBL, in the two opinions and orders that were issued here and by the Department of Commerce. And so in order for this Court here to essentially determine that the trial court abuses discretion because it's a Chevron Step 2 analysis, the Court would in effect determine not merely that Commerce and the CIT and its decision in this case... I'll repeat what I asked you. It would be helpful to hear your view of the objective merits, not why we should defer. Right. Our view of the objective merits is that at the end of the day only two Commissioners voted for material injury. Four voted explicitly against material injury. Three Commissioners found at least a threat of injury which is sufficient under the ITC 3.3 equals an affirmative determination voting provision to constitute an actionable majority in ITC proceedings. But three only found a threat if we defer to your interpretation that a threat is always subsumed within an injury determination, right? That's a predicate to what you're saying right now. But if that was otherwise then they would be sitting in different chairs and the domestic coalition would have lost because there wouldn't have been time. That's correct. At the end of the day in order to reach an affirmative determination there had to be three votes in the affirmative. But in order to make it to three votes you have to have all three of those votes. And so when you have the third Commissioner who concurred in the opinion on the narrowest grounds at the end of the day I suppose to answer your question more directly a way out of the box that you're setting up, Your Honor is that one doesn't have to determine that yes, the two Commissioners votes inherently entail a third vote. One can simply apply the Marx principle and determine that the appropriate way to consider this opinion is that the controlling vote is the Commissioner who concurred in the judgment on the narrowest grounds. And again, that would be Commissioner Pinkert's affirmative threat but negative injury vote. And that would absolve the Court of needing to deal with the issue of what or what not the broader votes might inherently entail. Any more questions? More questions? Thank you, Mr. Kerland. Thank you, Your Honor. Mr. Marschak, you have three minutes for the Yes, Your Honor. I'd like to talk about the objective merits. The objective merits goes to the purpose of Congress and the purpose of enacting the general rule and the special rule. That goes back to the 1979 Act. And Judge Gordon hit on that perfectly in his opinion slipped up and paid date of his opinion He says the purpose of Section Special Rule and General Rule was to implement the provisions of these agreements prohibiting the collections of duties during the provisional measures period unless the final determination is that there is material injury or threat of material injury which but for the provisional measures suspension of liquidation would have been material injury. So the purpose is that the general rule only applies if there is an affirmative determination of material injury and but for. So you have to have at least three votes for the general rule based on the purpose of the statute to follow the international code in 1979. In 1994, the Uruguay Round Agreement Act was enacted and there the purpose again in this Statement of Administrative Action, it says and this is page 20 of our brief, it says Article 10 provides several exceptions to this general principle that anti-dumping duties in this case for final determination will apply to reports entered after the final determination is made. So the general purpose of the code was you could only apply anti-dumping duties retroactively if you have an affirmative determination to commission material injury or threat of affirmative but for. So that's the purpose of Congress. The purpose of Congress was only if you have affirmative material injury or affirmative but for to allow the general rule to apply. In our case, you only have two votes. So you have four votes saying that the special rule should apply or that there should be no injury at all. So if we have two for retroactive application and four against retroactive application  should apply in our case and that's the objective of Congress. Petitioners have not cited to any other congressional intent. That's a congressional intent and that's objective. So we believe objectively we win. We believe that based on ambiguity we win. I think petitioners are hard pressed to say that the statute isn't ambiguous on its face. You look at one section, you go one way. You look at another section, you go another way. When Congress wrote the law, I don't think the statutory language affirmatively said one way or another. So you look at the purpose and then you look at did the Department of Commerce do the right thing. Did they accomplish the purpose? Should you defer? And we say absolutely. You have congressional purpose based on the statement of administration, straight of action, based on the code, based on the determination in MDL that goes back to 1992, which was in effect before the Uruguay Round Agreement Act and everything supports that view. There's really everything against nothing and we believe it's a tortured interpretation of statutory language by saying it's unambiguous. Thank you. Thank you, Mr. Marcia. It's time to talk faster, Mr. Marcia. Three minutes is tough, Your Honor. And Mr. Feldman, you have a different point, I trust? Thank you, Your Honor. May it please the Court. Yes, I want to address jurisdiction and standing. There is neither in this case. The appellant claims that it has standing under 1516A but to be here under 1516A jurisdiction would have to apply under 1581C, which means this would have to be a final determination as enumerated in the statute. But appellant's complaint says that they're appealing an order not a final determination and indeed this order involves a decision taken by the Department of Commerce outside and after the final determinations. Therefore, there is no jurisdiction under 1581C and therefore there's no standing. But we assume jurisdiction of interlocutory orders pertaining to injunctions from the CIT under C, right? No, under I. And in any event that wouldn't apply here either because under 1292 the rule that applies for jurisdiction in this Court is 1292D because that's the specific provision for the Court of Appeals for the Court of International Trade. That provision requires a certification from the CIT but this is an important question. So if there's no jurisdiction the injunction will stand? No, if there's no jurisdiction then their appeal must be dismissed and the injunction must be dismissed because there was no jurisdiction at the CIT nor here. There's no jurisdiction under C because this is not a final determination. There's no jurisdiction under I because they haven't pled any cause of action. They don't identify the APA, they don't plead any cause of action and they don't establish any standing. The only claim they have for standing is under 1516A which is conferred by being an interested party and a party to the proceeding for a final determination but not for this case which is not an appeal of a final determination. So there's no under 1516A and there's no standing even argued or claimed by them under any other terms. And there's no final decision then? There's no final decision, no. Then the injunction would stand? No, the appeal should be dismissed and the lower court already denied the injunction and permitted it to stay. In American Signatures, which is a 2010 case, this court expressly stated that jurisdiction was proper under 1516C1 which provides exclusive jurisdiction in any case over which the court would have jurisdiction of an appeal under 1295. 1295A5 provides appeals from CIT. Now it says final. 1292A, however, specifies that courts of appeal shall have jurisdiction of appeals from interlocutory orders from the district courts, etc. I would direct you, Your Honor, to the plain language of 1292A, B, and D and C because the first sentence in 1292 accepts D. So then when you go to C, it refers only back to A and B. So D has been accepted in the first sentence of 1292A and D is accepted because it's the rule that applies to the CIT. A applies to district courts. The CIT is not a district court and that's why it has a special rule. And the special rule requires for you to hear an interlocutory order appeal from the CIT. It needs to be certified by the CIT judge, which has not occurred in this case. That's the plain language of the rule. You just have to read the rule. Thank you, Mr. Feldman. Mr. DeFrancesco. Thank you. Thank you, Your Honor. Just quickly, a few points I'd like to make. First, on Mr. Marshak's assertion that the legislative history supports their position. We would again direct Your Honors to look at the structure of the general and special rule. Again, as we said earlier, the one and only time this but-for test exists in the general and special rule itself, under 1677-7, where Congress sets out the threat factors that commissioners are supposed to examine. The but-for test does not exist there. So when Congress was enacting the general and special rule, they effectively subdivided threat votes into two groups and treated one group of threat determinations to be where the general rule should be applicable and another group of threat votes to be only where the special rule is applicable. In other words, what Congress was saying is, we want the general rule to be treated as the general rule, as the word general would imply, and that it should be applied more often. And again, that goes to examining whether, as we said before, when considering where you have a situation where you have two affirmative threat votes and one affirmative present material injury votes, that you ought to be considering the two affirmative threat votes. And I want to draw Your Honor's attention, again, this is an appeal of a preliminary injunction motion. To the extent that this is a question as to how 1677 and whether we should be attributing a finding of threat to commissioners that made present material injury findings, that we believe we ought to be granted the preliminary injunction so that the lower court could have a fair opportunity to address all of these issues, that to attribute threat of material injury findings to commissioners that didn't actually make those findings and didn't expressly review those findings would be something that we believe would go beyond 1677 and something that the statute wouldn't support. And the lower court ought to have an opportunity to review this before. To give Your Honors an idea of what this industry looked like when we filed this case, at the time we filed this case there were nine domestic producers. At the time of the commission's vote, when they voted for present material injury, there were only three. They were suffering grievous losses. The subject imports were surging into this country at an alarming rate and Commissioners Williamson and Aronoff found that the domestic industry ought to receive relief from those imports. And we believe that in order to litigate these issues we need to have this preliminary injunction in order to get to those issues so that the domestic producers that remained can receive the relief that we believe they're owed under the statute. And without the preliminary injunction You only got two of the commissioners to buy that position. Yes, Your Honor. Of the affirmative votes, the two commissioners agreed with us on that position and one commissioner found threat. Aren't there six commissioners? Yes, Your Honor. But again, as we've discussed, when analyzing under the statute of 1677-11 Congress has said that the affirmative votes when there's a tie, as we have here, that those three commission determinations mean that it's an affirmative determination by the commission. And at that point, as we've said, it would be appropriate to examine only those affirmative votes when determining whether to apply the general rule or the special rule. And to just close quickly as we've said, without a preliminary injunction we will have no ability to examine these issues further. The Department of Commerce will order Customs to liquidate these entries that came in that the commissioners have found that we believe a majority of the affirmative votes have found to be injuring us and we will be denied relief that we should be owed under the statute. So on behalf of the Wind Tower Trade Coalition Wait a minute. Do we have jurisdiction? Yes, sir, Your Honor. As we laid out in our brief and as you correctly pointed out, in 1292-C1 is the operative portion of the statute where this court hears appeals of preliminary injunction motions in the interlocutory portion and again, as Your Honor correctly pointed out, under a similar situation when examining whether a preliminary injunction was appropriate. So finally, as we've said on behalf of the U.S. industry, its workers we'd like to thank the court today and we'd request that the court grant our request for relief in a preliminary injunction. Thank you. Any more questions? Thank you, Mr. DeFrancisco and thank all of you. The case is taken under submission.